[No. 29721. Department Two. October 25, 1945.]

LEROY M. HOKENSON, *Respondent*, v. IRMA H. HOKENSON, *Appellant*.[1]

[1]Reported in 162 P. (2d) 592.

*Simmons & McCann,* for appellant.

*William V. Cowan,* for respondent.

JEFFERS, J.—This is an appeal by Irma Hokenson from an interlocutory decree of divorce entered on May 12, 1945, whereby Leroy Hokenson, plaintiff, was awarded the decree on the ground of cruelty. By such decree defendant was denied a decree of divorce and the other relief asked for in her cross-complaint, other than that plaintiff was ordered to pay defendant two hundred dollars on account of attorney's fees. No contention is made by either party on this appeal that a decree of divorce should not have been granted, and no serious contention is made by appellant that the trial court was not justified in granting a decree to respondent. The only question argued by appellant is that the trial court did not make an equitable division of the community property.

The material facts leading up to the divorce are not greatly in dispute. The parties were married in November, 1938. Appellant, at the time of her marriage, was eighteen years of age, and had lived all her life at Issaquah, Washington. Respondent, at the time of the marriage, was about twenty-one years of age, and was living at Renton. These young people had each graduated from high school and had acquired no property of any kind at the time of their marriage. There are no living children as the result of the marriage. They lived in a cabin belonging to an uncle of respondent during the first year of their married life, and respondent worked for his father in a feed store. In fact, respondent worked for his father until July, 1942, when he went to work in the Lake Washington shipyards.

In 1939 respondent's father financed the building of a small three-room house with bath, on land owned by respondent's parents, and the parties hereto moved into this house in the fall of 1939. The details of the transaction between respondent and his parents relative to this house

are far from clear. About all the testimony shows is that the parties were to get the house when the note to which we shall refer was paid. It does not appear that anything was said about how much land was to go with the house, whether they would get a deed, or what evidence of title, if any, was to be given. The only instrument in writing bearing upon this matter is a promissory note dated October 1, 1939, signed by Leroy and Irma Hokenson, payable to the order of Earl Hokenson or Agnes Hokenson, father and mother of respondent. This note was given for the principal sum of two thousand one hundred fifty dollars, and was payable fifteen dollars or more on November 1, 1939, and a like payment on the first of each month thereafter until the whole sum of principal and interest had been paid. The note provides for interest at the rate of five per cent per annum from October 1, 1939. In the body of the note appear the following words: "For a new four room plastered house," and at the end of the note is the following: "and furniture." It seems to be admitted that respondent's parents purchased and placed in the house about two hundred dollars worth of furniture, and that this amount was included in the two thousand one hundred fifty dollars.

On the back of the note and attached slips are endorsements of payments credited on the note beginning with November 1, 1939, and each month thereafter up to and including January, 1944. The endorsements indicate that a payment of fifteen dollars was credited on the note each month, first to interest and the balance to principal. On the date of the last credit, it appears that $1,805.28 was still due on the principal.

Respondent continued to work in the shipyards until April, 1943, when he went to southern Alaska to work in the woods on some army or navy project. It does not appear from the record that appellant ever manifested any dissatisfaction with the marriage relation until after respondent had gone to Alaska.

According to the testimony of respondent and the testimony of appellant herself, during the first months respond-

ent was in Alaska her letters were the usual letters of an affectionate wife.. Plaintiff's exhibit 3, a letter written by appellant to respondent under date August 3, 1943, was introduced as typical of these letters, and shows no indication of dissatisfaction on the part of appellant. The letter ends as follows: "Goodbye and write soon. Love, Irma."

However, on October 20, 1943, appellant wrote respondent a letter (plaintiff's exhibit 1) which indicates an entirely different attitude on her part, and appellant admitted that this letter was the first time respondent was apprised of the fact that she was not satisfied with the marriage relation, and did not desire to go on with it. The letter contains no charges against respondent, but states that appellant had not been happy for some time but did not like to tell respondent because she knew how it would hurt him. The letter contains the following paragraph:

"I don't want any of our things, just the ones that belong directly to me, and none of your money. I'll give you the bank book when you get home, because I do want to see you and tell you personally, like I should, exactly how things stand."

Appellant's reason for writing to respondent as she did during the first months he was in Alaska is shown by the following paragraph found in the letter of October 20th:

"About the letters I've written this summer, I guess you think I'm a hypocrite, but knowing how disagreeable it was and how lonely you must have been up there I thought the least I could do was write like I did to make it a little pleasanter."

On November 10, 1943, appellant wrote respondent another letter (plaintiff's exhibit 2). We quote the last paragraph:

"If I had known you'd get my letter so soon I would have waited a while longer but its too late now and please don't worry over me because I'm not worth it at all. As ever, Irma."

Respondent returned from Alaska in November, 1943. He saw appellant soon after his return and tried to get her to come back and live with him, but this she refused to do.

At this meeting appellant gave the bank book to respondent, as she had promised to do, and it does not appear that at this time or at any time up until January, 1944, just before respondent joined the navy, did appellant make any claim to any of the money in the bank or other community property.

The bank account to which we have referred stood in the name of Mr. or Mrs. Leroy Hokenson. When respondent came down from Alaska he deposited six hundred fifty dollars in this account, November 22, 1943. On January 11, 1944, which was after respondent had returned from Alaska and after his conversation with appellant, respondent drew thirteen hundred dollars out of the account, leaving a balance of $122.14. At the time of the hearing before the trial court, respondent testified he had spent all of the thirteen hundred dollars except two hundred dollars which he had left with his mother.

At the time appellant refused to continue the marriage relation, it appears that the parties had bonds of the value of eleven hundred dollars. Sometime after November, 1943, and before January 19, 1944, at which time respondent joined the navy, respondent sold these bonds and received eleven hundred dollars therefor. As near as we can determine from the record, with the money received from the bonds he purchased new bonds in the amount of nine hundred dollars made payable to his mother, Agnes Hokenson. Where these bonds were at the time of trial does not clearly appear. Mrs. Hokenson testified she did not have them and knew nothing about them.

While respondent testified at the trial that he had no community property at that time, and while we do not find that he was specifically asked whether or not he had in his possession bonds of the value of nine hundred dollars, the trial court, as appears from its memorandum opinion, seemed to assume that respondent had these bonds.

Respondent joined the navy about January 19, 1944, and is still in the service. This action was started by respondent in July, 1944, at which time he was home on leave. Appellant has received fifty dollars per month since Jan-

uary, 1944, twenty-two dollars of which was deducted from respondent's pay and the balance furnished by the government.

Immediately after respondent left for Alaska in April, 1943, appellant went to live with her parents at Issaquah.

Appellant's testimony shows that about a month after respondent left for Alaska she started to work; that for the first month she received twenty-four dollars per week; that since that time, with the exception of five months, August, 1944, to January, 1945, when she did not work, she has been employed continuously, and has received thirty-six dollars a week. Since January, 1945, appellant has been and still is working for her father, and receives a salary of thirty-six dollars per week. Appellant testified that she averaged about one hundred forty-five dollars per month for the seven months she worked in 1944; that she received four or five hundred dollars for the work she did in 1943.

Appellant further testified that when she moved out of the house she took with her the linen, dishes, silverware, and washing machine, the value of which she estimated to be about one hundred fifty dollars. It also appears that a trailer owned by the parties was sold for fifty dollars, and this money was turned over to appellant.

After respondent left for Alaska and after appellant had moved out, the house was rented for a time for thirty-five dollars a month, but at the time of trial it was and for some time had been rented for twenty-five dollars per month. It is not clear whether appellant or respondent's parents collected the rent on the house at the time it was first rented and up until about October, 1943; but, be that as it may, it is admitted that until about the date last mentioned, fifteen dollars of the rental was applied on the note, certain payments were made on an insurance policy, and the balance of about eleven dollars a month was turned over to appellant.

It appears from the testimony of Agnes Hokenson that after October, 1943, appellant did not come for the rent, and while apparently appellant and respondent's parents had been on good terms, appellant never came to the home

of respondent's parents after October, 1943, which was about the time she wrote the letter to respondent to which we have referred.

Appellant's attitude, as indicated by not attempting to collect the rent, and as indicated by her letter of October 20, 1943, and by her turning over to respondent their bank book upon his return from Alaska, shows that at that time she was not claiming any of the community property, other than the things she had taken from the home.

It appears from respondent's testimony that after appellant had told him she would not go back and live with him, and in January, 1944, he turned the house back to his parents. The note hereinbefore mentioned was introduced as plaintiff's exhibit 6, and is marked canceled. From January, 1944, up to the time of trial, respondent's parents exercised control over this property, collected the rent, and made necessary improvements to the extent of about two hundred fifty dollars.

It does not appear that appellant ever made any claim to respondent's parents that she had or was claiming any interest in the house until her answer in this case was filed, which was sometime in July, 1944. It does appear from respondent's testimony that just before he went into the navy appellant said "that she wanted part of the money."

While appellant made some contention before the trial court that she had heard that respondent was going out with some women while he was in Alaska, she admitted that she did not seek to verify this rumor, although her own father was working near if not on the same job as respondent in Alaska, and she further admitted that at no time did she charge respondent with such conduct. Appellant also made some claim that respondent used intoxicating liquor to excess, but we are satisfied, as was the trial court, that appellant failed completely to substantiate either of the above charges.

About the only things that appellant really claimed were the cause of her leaving respondent were that he was indifferent towards her and was away from home a good deal.

In regard to these charges, appellant admitted that respondent was away from home only when he was at work, and her statements in regard to his indifference towards her were in effect that he did not take any interest in their home.

■ The trial court stated, and we are in accord with that statement, that appellant wholly failed to show any legal grounds for divorce, and we may say further that we are of the opinion she wholly failed to show or give even a reasonable ground for abandoning the home and leaving respondent.

This was the situation confronting the trial court when it came to adjusting the property rights of these parties. The money had been spent, the bonds originally of the value of one thousand one hundred dollars had been sold and bonds of the value of nine hundred dollars purchased, made payable to respondent's mother (just where these bonds are does not appear), the house in which on January 1, 1944, the parties had an equity of some $344.72 had been turned back by respondent to his parents, and the note canceled.

Appellant, since January, 1944, has received fifty dollars a month as the result of respondent's being in the navy, and so far as the record shows is still receiving this allotment, all of which she has undoubtedly used for her personal use. This money was undoubtedly community property. Appellant also received an average of one hundred forty-five dollars per month for seven months in 1944, four or five hundred dollars in 1943, and since January 1, 1945, has been receiving thirty-six dollars per week. In addition to this, she took from the home certain articles of the value of one hundred fifty dollars, and the court awarded her in this action two hundred dollars as attorney's fees.

■ It is true that the earnings of a wife while she is living separate from her husband are her separate property. Rem. Rev. Stat., § 6896 [P. P. C. § 434-35]. The court, however, undoubtedly took into consideration, in making this property settlement, the fact that appellant was a young, able-bodied woman and had been, and was, earning thirty-six dollars per week.

■ While we do not desire to be understood as holding that, because a wife fails to prove legal grounds for a divorce, and a divorce is granted to the husband, the wife should be penalized to the extent of depriving her of some equitable property settlement, we are of the opinion, after a consideration of the record, that it cannot be said the trial court abused its discretion in not awarding to appellant some amount of money, some part of the bonds, or some interest in the house.

It seems to us that the disposition of the community property made by respondent was brought about by appellant's own voluntary acts. It does not appear but what the money in the bank was drawn out by respondent, the bonds sold, and the house turned back to respondent's parents after appellant had stated to respondent she would not live with him and did not desire any of the property, and before she apparently changed her mind.

We conclude, therefore, that the trial court, under the facts in this case, made as equitable an adjustment of the property rights of the parties as it was possible to make, and that the judgment of the trial court should be, and it is; affirmed.

BEALS, C. J., GRADY, ROBINSON, and BLAKE, JJ., concur.